| iPLOTKIN, Judge,
dissenting with written reasons:
Because I believe that L-P proved the existence of a contract under Louisiana law, I respectfully dissent.
In his reasons for judgment, the trial court indicated that his rejection of the plaintiffs breach of contract claim was based on the *438 undisputed fact that no written contract was ever executed between the Sewerage District and L-P.
However, the fact that no written agreement was ever executed between the parties is not determinative of whether a contract existed. Louisiana has long recognized the fact that oral contracts are legally binding, as demonstrated by the following excerpt from this court’s opinion in Whitney National Bank v. Poydras Center Associates, 557 So.2d 422 (La.App.4th Cir.1990), which is quoted by the majority:
A contract is defined as “an agreement, by which one person obligates himself to another, to give, to do or permit, or not to do something, expressed or implied by such agreement.” LSA-C.C. article 1761. Por a valid contract to exist, there must be (1) parties legally capable of contracting; (2) their consent legally given; (3) a certain object, which forms the matter of agreement; and (4) a lawful purpose. LSA-C.C. article 1779; Morphy, Makofsky & Masson, Inc. v. Canal Place 2000, 5[3]8 So.2d 569 (La.1989). A contract can be express or implied in fact. An implied in fact contract is one which rests upon consent implied from facts and circumstances showing mutual intention to contract. Morphy, supra; V-8 Taxi Cab Service, Inc. v. Hayes, 322 So.2d 442 (La.App.4th Cir.1975). Such implied in fact contracts are not different in their legal effect from express, written agreements. Comment, Actio De In Rem Verso in Louisiana: Minyard v. Curtis Products, Inc., 43 Tul. L.Rev. 263, 298 (1969).
Id. at 424-25.
l2In the instant case, the existence of a contract between the Sewerage District and L-P may easily be implied from the facts and circumstances of the ease, which unquestionably show a mutual intent between the two parties to contract. Certainly the fact that L-P was willing to bear the greatly increased cost of installing a sewerage system much in excess of the system which would be necessary to service its proposed subdivision, at a greatly increased cost, is important evidence of L-P’s belief that the parties had reached an agreement. The fact that LaRose immediately approached Tedesco seeking $250 per lot when he learned that Tedesco was developing a subdivision within the area meant to be serviced by the system that L-P had installed is other evidence of L-P’s belief.
More important, however, are the actions of the Sewerage District board which indicate its intent to contract with L-P. The Sewerage District board initially authorized the contract by motion passed August 8, 1983, which gave the chairman of the of the Sewerage District the authority to execute a “service agreement” with L-P concerning future tie-ins to the system serviced by the lift station on Genie Street. Then, the September 15, 1983 minutes indicate that the members of the Sewerage District actually believed that a contract had been executed when they set the fee for tie-ins at $250 per lot. The September 15 minutes refer to a “prior contract executed between [L-P] and the Board.” The fact that all of these actions occurred after the completion of the sewerage system, as pointed out by the majority, has no bearing on whether the parties entered an oral contract.
Moreover, two members of the 1983 Sewerage District board, Donald A. Romero and Melvin J. Ziegler, testified at trial. Both Romero and Ziegler indicated their belief that the Sewerage District had entered an agreement with L-P and that they had voted for the agreement because they thought it was “fair.” Both Romero and Ziegler admitted that, to their knowledge, no agreement was ever executed in response to the board’s September 15 motion.
In finding that no valid contract existed between the Sewerage District and L-P, the trial judge and the majority rely primarily on the Sewerage Commission’s claim that the Sewerage District chairman’s failure to execute the agreement as authorized by the September 15,1983 motion was rooted in the fact that an assistant district attorney told the chairman that such an agreement would be illegal. However, such a conclusion is not supported by the record. Although the record contains a copy of a July 25, 1983 letter toJjAssistant District Attorney Marcel Gue-niot asking for a legal opinion on the question, Gueniot never rendered a written opin *439 ion on the question. Michael L. Merkl, who was the director of the board in 1983, testified at trial that Gueniot informed him orally of his opinion that such an agreement would not be legal, in his opinion.
However, the official minutes of the Sewerage District dated July 27, 1983 — -just two days after the letter to Gueniot seeking for an opinion on the legality of such an agreement — indicate that Gueniot specifically requested that the minutes reflect that he rendered no opinion whatsoever on the subject. Moreover, the Sewerage Board failed to present any evidence that the agreement was in fact illegal, relying instead on Merkl’s testimony that Gueniot told him orally some ten years ago that such an agreement would not be legal.
The Sewerage Commission also argues on appeal that the alleged agreement between L-P and the Sewerage District is illegal because it would violate the Public Bid law — a claim on which the majority places special emphasis. In fact, the majority concludes, without citing any authority for that conclusion, that “[t]o allow a developer to construct sewer improvements and then after the fact permit that same developer to be reimbursed for the cost from future users would circumvent the Public Bid Law and would constitute a franchise to collect monies for a system that is owned and operated by the public agency.” That conclusion is improper for two reasons. First, and most importantly, the Public Bid Law argument made by the Sewerage Commission on appeal was not presented to the trial court and the trial court made no conclusion on this issue; thus, the issue is not properly before this court. Second, the facts of the instant case are distinguishable from those normally found in cases alleging violation of the Public Bid law since this case does not deal with the expenditure of public monies.
Thus, I would find that the trial court judgment holding that no valid contract existed between the Sewerage District and L-P is manifestly erroneous. The record indicates that all the necessary elements for perfection of a valid contract were present in the instant case. The record reflects the existence of two parties legally capable of contracting; their consent legally given; a certain object, which formed the matter of agreement; and a lawful purpose. LSA-C.C. article 1779; Whitney National Bank, 557 So.2d at 424; Morphy, Makofsky & Masson, Inc., 538 So.2d at 569.
UMoreover, the terms of the agreement are easily ascertained. The Sewerage District made a commitment to L-P to require that any future developer seeking permits for a subdivision within the area bounded by the Twenty and Forty Arpent Canals between and including Story Park Subdivision Extension and Meraux Lane Subdivision Extension be required to tie-into the sewerage system constructed by L-P and to pay L-P $250 per lot as a prerequisite to the granting of a permit to develop the subdivision. In return, the Sewerage District received a sewerage system with the capacity to service some 1,850 lots, which relieved the Sewerage District from the responsibility both for extending the capital cost for constructing the sewerage system or for maintaining numerous small lift stations on each separate subdivision development.
The next step in the analysis is simple. Obviously, when the Sewerage Commission, as successor to the Sewerage District, failed to require that Tedesco tie-in to L-P’s sewerage system and pay L-P $250 for each lot he planned to develop in Deer Creek subdivision, the Sewerage Commission breached its contract with L-P. In fact, the Sewerage Commission went a step further and required Tedesco to construct an additional system to service Deer Creek Subdivision and to relieve the overflow problems in an adjacent area, making it inequitable for L-P to ever collect money from Tedesco for its subdivision, which unquestionably is located within the established service area for L-P’s sewerage system. In so doing, the Sewerage Commission even allowed Tedesco to use the rights of way obtained by L-P and to utilize a bridge over the canal constructed by L-P when Tedesco built its own sewerage system in response to the Sewerage Commission board’s requirements. All of these actions were taken in violation of the contract between the Sewerage District and L-P.
*440 As the successor to the Sewerage District, the Sewerage Commission is liable to L-P for its violation of the contract. In its petition, L-P sought recovery of $315,750, presumably L-P’s estimate of the total increased cost of developing the increased-ea-pacity sewerage system which was not recouped through payments from Klees and Tedesco. However, L-P’s claim for the entire amount of the money is premature. The agreement between the Sewerage District and L-P entitles L-P to payment only for lots actually being developed in the subject area. The only breach of contract committed by the Sewerage Commission at the time of trial was allowing Tedesco to develop Deer Creek Subdivision without requiring that it tie-in to L-P’s system or pay L-P $250 per lot. Thus, L-P’s recovery is limited to $250 | Btimes the number of lots developed by Ted-esco, a number which cannot be determined by the record in this case. Thus, the case should be remanded to the trial court for determination of damages.